IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| DONALD EARL CRIHFIELD, JR., | ) | |
| Plaintiff, | ) | Civil Action No. 4:15-cv-49 |
| | ) | |
| v. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | By: Joel C. Hoppe |
| Defendant. | ) | United States Magistrate Judge |

Plaintiff Donald Earl Crihfield, Jr., proceeding pro se, asks this Court to review the

Commissioner of Social Security's ("Commissioner") final decision denying his applications for

disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II

and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434, 1381–1383f. The case is

before me by referral under 28 U.S.C. § 636(b)(1)(B). ECF No. 12. Having considered the

administrative record, the parties' briefs, and the applicable law, I find that the Commissioner's

decision is supported by substantial evidence. Therefore, I recommend that the Court **DENY**

Crihfield's motion for summary judgment, ECF No. 13, **GRANT** the Commissioner's motion

for summary judgment, ECF No. 14, and **AFFIRM** the Commissioner's final decision.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v.*

*Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court

asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and

1

whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461

U.S. 458, 460–62 (1983); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Crihfield protectively filed for DIB and SSI on November 7, 2011. Administrative Record ("R.") 132, ECF No. 9. He alleged disability beginning on December 1, 2009, because of back problems, disc problems, scoliosis, and a growth on disc; limited education; high blood pressure; depression; and anxiety. R. 170. Crihfield was forty-five years old at the time of the alleged onset date. *Id.* He had worked primarily in construction and also as a boiler maker. R. 180.

Crihfield's claims were reviewed and denied by Disability Determination Services ("DDS"), the state agency, initially on February 16, 2012, R. 170–75, 176–84, and again on reconsideration on July 24, 2012, R. 187–94, 195–205. He requested a hearing before an ALJ, R. 230, which was held on April 3, 2014, R. 146. Crihfield appeared with counsel at the hearing[1] and testified about his past work, medical conditions, and the limiting effect these conditions had on his daily activities. *See* R. 148–59. A vocational expert ("VE") also testified at this hearing regarding the nature of Crihfield's past work and his ability to perform other jobs in the national and local economies. *See* R. 159–65.

On April 25, 2014, ALJ Brian B. Rippel issued a written opinion denying Crihfield's applications for DIB and SSI. R. 132–39. ALJ Rippel found that as of June 12, 2011, Crihfield had a severe impairment of degenerative disc disease, but had no severe impairments prior to that date. R. 134. He determined that this impairment did not meet or equal the objective criteria of

---

[1] On August 13, 2015, Crihfield's attorney notified the Appeals Council that he had been released as Crihfield's attorney of record. R. 23.

Listing 1.04, 20 C.F.R. pt. 404, subpt. P, App. 1, because despite evidence of nerve root compression, there was no evidence of atrophy and other clinical findings of the lumbar spine were normal. R. 135–36. ALJ Rippel found that Crihfield had the residual functional capacity ("RFC") to perform light work[2] except that Crihfield could frequently balance; occasionally stoop, kneel, crouch, and climb ramps and stairs; never crawl or climb ladders, ropes, and scaffolds; and only have occasional exposure to extreme cold, wetness, vibrations, and hazards such as unprotected heights or hazardous machinery. R. 136. ALJ Rippel determined that based on this RFC, Crihfield could not perform any of his past relevant work. R. 138. Relying on the VE's testimony, ALJ Rippel found at step five that Crihfield could perform other jobs that existed in significant numbers in the national and local economies, including packer, cashier, and café attendant. R. 138–39. Thus, ALJ Rippel ruled that Crihfield was not disabled as defined in the Act from the alleged onset date of December 1, 2009, through the date of the decision. R. 139.

Crihfield appealed this decision to the Appeals Council, R. 357, and submitted additional medical evidence, R. 26–119, 167–69. The Appeals Council initially declined to review Crihfield's appeal, R. 8–11, but then set aside that decision to consider additional information, R. 1–4. Nevertheless, the Appeals Council concluded that the newly submitted information did not provide a basis for changing the ALJ's decision. R. 2. It further noted that some of the submitted medical evidence, R. 167–69, was not new evidence because it was duplicative of evidence already in the record, R. 432–34, 470–72, 534–36, and that the remainder of the submitted

---

[2] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these lifting requirements can perform light work only if he also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999).

4

medical evidence, R. 26–119, was not relevant because it concerned the period after the ALJ's

decision. R. 2. This appeal followed.

III. Facts

*A.    Relevant Medical Evidence*

The earliest evidence in the record shows that Crihfield visited the Full Care Medical

Center ("Full Care") on September 28, 2009, with a history of back pain and degenerative joint

disease. R. 454. The physical exam revealed extremity and musculoskeletal abnormalities,

including bilateral flat feet and scoliosis. *Id.* Crihfield had full flexion, negative Romberg's sign,

and positive straight leg raise testing bilaterally at sixty degrees. *Id.* Crihfield was diagnosed with

chronic back pain and given a prescription for Ultram. *Id.* Crihfield returned to Full Care five

times from October 2009 through January 2010, primarily for follow-up care regarding a gunshot

wound he sustained in his right foot. R. 450–53. During each visit, Crihfield was also assessed

with chronic back pain. *Id.* During one of these visits, on November 12, 2009, Crihfield reported

that his back pain limited his activity, and he complained of a shooting sensation down his leg

from the back pain, but not of pain from the gunshot wound. R. 452. The doctor noted that

Crihfield requested an MRI, but was informed that out-of-pocket costs for the imaging and any

subsequent surgical fees would be too high. R. 452–53.

Crihfield next visited Full Care on September 17, 2010, with a chief complaint of

uncontrolled chronic back pain. R. 448. A physical exam revealed abnormal extremities,

scoliosis, and flexion of sixty degrees, and Crihfield was assessed with chronic back pain. *Id.* He

returned to Full Care on October 15 with a chief complaint of exacerbation of chronic back pain.

R. 447. Crihfield reported that he was unable to move in the morning and that it took him "a

while to get going." *Id.* A physical exam showed abnormal findings in the extremities and

5

scoliosis, but no effusion in the knees. *Id.* Crihfield was assessed with chronic back pain and bilateral knee pain, and his prescription of Lortab was increased. *Id.* During Crihfield's next visit on November 12, he presented with a chief complaint of exacerbation of chronic back pain and was observed to be stooped over and in pain. R. 446. This time, Crihfield noted that his chronic back pain was better in the morning, but got worse as the day progressed. *Id.* He also reported that sitting and standing made him uncomfortable and that he had bilateral sciatica. *Id.* A physical exam showed abnormal extremities and general appearance (i.e., stooped over in pain). *Id.* His knees showed no effusion, but the exam revealed scoliosis and a left paraspinal spasm. *Id.* Again, Crihfield was assessed with chronic back pain and bilateral knee pain, his prescriptions for Lortab and Neurontin were increased, and he was given an additional prescription for Robaxin. *Id.* During the next visit on December 7, Crihfield reported that his chronic back pain was stable, but a physical exam still revealed abnormalities in the extremities and scoliosis. R. 445. Crihfield's chronic back pain and bilateral knee pain was assessed as stable, and he was given one refill of his medications. *Id.*

Crihfield's next visit to Full Care occurred on February 1, 2011. R. 444. Crihfield's chief complaint was of pain in his knees and waist, but he said it was relieved by Neurontin. *Id.* The physical exam again showed scoliosis and abnormal findings in the extremities. *Id.* Crihfield was assessed with chronic back pain and bilateral knee pain and given a prescription for Naproxen. *Id.* On March 30, Crihfield reported with a chief complaint of chronic back pain and knee pain, but noted it was controlled. R. 442. The physical exam yielded normal findings, and the doctor refilled his medications. *Id.*

Crihfield saw James Abrokwah, M.D., when he returned to Full Care on June 8, and complained that he still experienced chronic back pain. R. 456. He reported that pain control was

6

adequate, he could function after analgesia, and he experienced no depression or anxiety. *Id.* Dr. Abrokwah's objective findings indicated negative Romberg's sign, no trophic changes, and pedal pulses present in the extremities. *Id.* Dr. Abrokwah noted scoliosis, full forward flexion in his back, and positive straight leg raise testing at forty degrees on both the left and right. *Id.* Dr. Abrokwah did not prescribe any medications during this visit, but he diagnosed Crihfield with thoracic or lumbosacral neuritis or radiculitis, unspecified; benign essential hypertension; and pain in joint involving lower leg. *Id.*

On June 12, Crihfield presented to the emergency room at the Dickenson Community Hospital ("Dickenson") with a chief complaint of left leg pain, starting in his hip and radiating throughout his entire leg, which began three weeks prior. R. 378. Crihfield characterized the pain as dull and aching and claimed it was aggravated by movement and weight bearing, but alleviated with rest. *Id.* A physical exam revealed normal findings, and Crihfield was diagnosed with leg pain. R. 379. Crihfield returned to the emergency room at Dickenson on July 15 following a motor vehicle accident with a chief complaint of left shoulder pain. R. 387. The intake form noted that Crihfield had a history of prescription drug abuse, and a physical exam revealed normal findings. *Id.* Radiology ordered left shoulder and left hip x-rays. R. 388. Two views of the left shoulder showed no fracture deformity or dislocation, R. 389, and two views of the left hip showed no fracture deformity and normal hip joint space, R. 390.

On August 3, Crihfield saw Dr. Abrokwah for a regular follow-up and presented with a chief complaint of exacerbation of chronic back pain following the motor vehicle accident the previous month. R. 457. Dr. Abrokwah also noted that Crihfield now had bilateral sciatica. *Id.* Crihfield reported that the pain control was adequate, he could function after analgesia, and he did not experience depression or anxiety. *Id.* Dr. Abrokwah's physical exam revealed Crihfield

7

had pedal pulses present in the extremities, full forward flexion, negative Romberg's sign, and no tropic changes, but he had scoliosis and positive straight leg raise testing at twenty degrees on both the right and left. *Id.* Dr. Abrokwah diagnosed pain in joint involving lower leg and thoracic or lumbosacral neuritis or radiculitis, unspecified, and he prescribed Lortab. *Id.*

On August 25, an MRI of Crihfield's thoracic spine revealed normal alignment and vertebral heights maintained throughout. R. 471. There was minimal disc protrusion at T6-T7, no spinal stenosis or cord compression at any level, and no compression fracture seen. *Id.* An MRI of the lumbar spine revealed mild convex left curvature of mid-thoracic spine, vertebral body heights maintained throughout, and spondylotic changes seen to a moderate degree throughout. *Id.* It also showed the T12-L1 disc to be normal; a left-sided disc bulge at L1-L2, with mild left neural foraminal narrowing without nerve compression; a broad-based right-sided disc bulge and osteophyte at L2-L3, which narrowed the right neural foramen to a moderate degree and exhibited mass effect upon the exiting right L2 nerve root; a disc bulge slightly eccentric to the left without significant spinal stenosis or neural foraminal narrowing at L3-L4; a broad-based disc protrusion and facet overgrowth at L4-L5, with mild narrowing of lateral recesses, neural foramina moderately stenotic bilaterally, but more so on the right, and possible compression of the exiting right L4 nerve root with the foramen; and a broad-based protruding disc osteophyte eccentric to the left and facet overgrowth at L5-S1, with left neural foraminal narrowing and evidence of compression of the exiting left L5 nerve root within the foramen. R. 471–72. The impression was levoscoliosis, spondylosis, and multilevel disc bulges and protrusions (as described above) with several levels of significant neural foraminal narrowing most notable on the right at L2-L3, on the left at L5-S1, and right greater than left at L4-L5. R. 472.

8

During his next visit to Dr. Abrokwah on October 31, Crihfield's chief complaint was that his chronic back pain rendered him unable to work. R. 458. He reported that pain control was adequate and he could function after analgesia, but he was unable to do house work, yard work, or go to work. *Id.* He further stated that he experienced depression and anxiety, and Dr. Abrokwah observed that Crihfield was moderately agitated and mildly depressed. *Id.* Dr. Abrokwah also noted scoliosis, no trophic changes, pedal pulses present in the extremities, negative Romberg sign, normal reflexes, forward flexion of thirty degrees, and positive straight leg raise testing at sixty degrees on the right and forty degrees on the left. *Id.* Dr. Abrokwah assessed Crihfield's chronic back pain and left leg sciatica as getting worse, and he diagnosed pain in joint involving lower leg and thoracic or lumbosacral neuritis or radiculitis, unspecified, for which he prescribed ibuprofen. *Id.*

Crihfield saw Dr. Abrokwah three times in 2012, first on February 15, R. 509–10, then on April 23, R. 507–08, and again on May 18, R. 505–06. At each visit Crihfield presented with a chief complaint of exacerbation of his chronic back pain and left sciatica, but his subjective reports differed. R. 505–10. On February 15, Crihfield reported that although pain control was adequate and he could function after analgesia, his pain got worse when he was on his feet. R. 509. He could perform house and yard work, but could not go out to work, and he experienced depression and anxiety. *Id.* On April 23, Crihfield reported that pain control was adequate; he could function after analgesia, perform house and yard work, and go out to work; and he experienced no depression and anxiety. R. 507. On May 18, Crihfield reported that pain control was inadequate, but he could still function after analgesia; he could perform house and yard work, but could not go out to work; and he experienced anxiety but no depression. R. 505. As for objective findings, Dr. Abrokwah noted pedal pulses present, scoliosis, full forward flexion, and

no trophic changes during each visit. R. 505, 507, 509. Dr. Abrokwah also noted that Crihfield

was using a cane on February 15, R. 509; had positive straight leg raise testing at seventy

degrees on the right and forty degrees on the left on February 15, *id.*, and positive straight leg

raise testing at sixty degrees on both the right and left on May 18, R. 505; had diminished range

of motion in all directions of the cervical spine, but no vertebral tenderness on April 23, R. 507,

and May 18, R. 505; and his pain was controlled on April 23, R. 507, but uncontrolled on

February 15, R. 509, and May 18, R. 505. During each visit, Dr. Abrokwah diagnosed thoracic or

lumbosacral neuritis or radiculitis, unspecified, and pain in joint involving lower leg. R. 505–10.

B.    *DDS Physician Opinions*

On February 16, 2012, Robert McGuffin, M.D., reviewed Crihfield's initial DIB claim as

it pertained to his physical conditions. R. 170–75. On February 17, Jeanne Buyck, Ph.D.,

reviewed Crihfield's initial DIB claim as it pertained to his mental conditions. *Id.* Dr. McGuffin

indicated that Crihfield had medically determinable impairments of essential hypertension and

other and unspecified arthropathies, but both were deemed non-severe. R. 174. Dr. Buyck and

Dr. McGuffin concluded that there was insufficient evidence to determine the severity of

Crihfield's allegations before December 31, 2010, Crihfield's date last insured. R. 173–74. Thus,

they found Crihfield to be not disabled for the purpose of his DIB claim without assessing an

RFC. R. 174–75. Richard Surrusco, M.D., and Andrew Bockner, M.D., affirmed these findings

on reconsideration of Crihfield's DIB claim on July 24. R. 187–94.

Dr. McGuffin and Dr. Buyck also considered Crihfield's initial SSI claim. R. 176–84. Dr.

Buyck concluded that Crihfield had no medically determinable mental impairment because

although he alleged suffering from limited education, depression, and anxiety, he had normal

mental status exams, his daily activities did not support a severe mental condition, he attended

10

school through tenth grade and was not in special education classes, and he was never diagnosed or treated for any mental impairment. R. 180. As for his medically determinable physical impairments, Dr. McGuffin concluded that Crihfield had non-severe essential hypertension, severe other and unspecified arthropathies, and severe spine disorders. *Id.* Dr. McGuffin assessed Crihfield's RFC and found exertional, postural, and environmental limitations. R. 181–83. As to Crihfield's exertional limitations, Dr. McGuffin found that he was limited to lifting and carrying twenty pounds occasionally and ten pounds frequently; standing and walking for six hours in an eight-hour workday; and sitting six hours in an eight-hour workday. R. 181. As to Crihfield's postural limitations, Dr. McGuffin found that he could frequently balance; occasionally stoop, kneel, crouch, and climb ramps and stairs; and never crawl or climb ladders, ropes, and scaffolds. R. 182. As to Crihfield's environmental limitations, Dr. McGuffin found that Crihfield should avoid concentrated exposure to extreme cold, wetness, vibration, and hazards such as machinery and heights. R. 182–83. As a result, Dr. McGuffin concluded that Crihfield was limited to light work and was not disabled. R. 183–84. In a reconsideration opinion of Crihfield's SSI claim on July 24, Dr. Surrusco and Dr. Bockner affirmed the findings of Dr. McGuffin and Dr. Buyck, R. 199–204, limited Crihfield to light work, and found him not disabled, R. 204.

C.    *Crihfield's Submissions and Testimony*

Crihfield submitted one function report as part of his claim for benefits. R. 295–302. He stated that he lived with family and described his days as spent doing a little laundry, a little cooking, a little cleaning, and other such tasks. R. 295. Crihfield used to be able to bend and lift more, as well as stand and walk longer, and his conditions affect his sleep as he constantly wakes up to improve his sleeping position. R. 296. Crihfield stated that his main problems with personal care involved bending over to tie his shoes, put on socks, or use the sink. *Id.* Crihfield reported

11

that he prepares his own meals, such as sandwiches, frozen dinners, and complete meals, daily. R. 297. Crihfield also did household chores for a couple of hours each week, including laundry, some cleaning, and a little mowing with a push mower on level ground. *Id.* Crihfield stated that he went outside every day and could do so alone, could drive a car, and shopped for food twice a month. R. 298. Crihfield could count change and use a checkbook, but could not pay bills or handle a savings account because he had no income. *Id.* Crihfield stated that his hobbies included building homes, which he could no longer do on account of his conditions. R. 299. He also indicated that he spent time talking with others almost every day, *id.*, and did not have problems getting along with others, R. 300. Crihfield indicated that his conditions affected his lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and stair climbing. *Id.* Crihfield stated he could walk for about ten to fifteen minutes before stopping to rest, finished what he started, followed written and spoken instructions "ok," and got along well with authority figures, but he did not handle stress or changes in routine well. R. 300–01. Crihfield also stated that he used a brace, which had been prescribed by a doctor five years earlier, and a cane. R. 301.

At the administrative hearing, Crihfield testified that he lives with his sister and he does not have any minor children. R. 149. Crihfield described his past jobs and stated that he last worked in 2011 when he was laid off during a plant shutdown. R. 149–51. After being laid off, Crihfield did not file for unemployment benefits because he was hoping to go back to work, but ultimately he never applied for another job because of his physical impairments. R. 151. Crihfield stated that he suffered from serious back issues, including scoliosis and sciatica, which caused left leg pain that prevented him from walking at times. R. 152. Crihfield's doctors had recommended surgery, but he could not afford it without insurance and a job. R. 152–53. Crihfield further testified that he suffered from depression and anxiety, had never been

12

hospitalized for a mental conditions, and used to receive treatment and take medication. R. 155–56. Crihfield claimed he could walk for at most a mile before having to stop because his legs would swell, he had problems bending over, and he could stand for at most thirty minutes before having to sit down. R. 153. He stated that he used a cane to ambulate, which Dr. Abrokwah had prescribed to him, and he had to lie down a couple of times per day. R. 154–55. As to his daily routine, Crihfield testified that he could barely cook and clean, and sometimes he could cut the grass with a riding mower. R. 156.

## IV. Discussion

Crihfield's motion for summary judgment, liberally construed, presents five reasons "why the Commissioner's decision is not supported by substantial evidence or why the decision otherwise should be reversed or the case remanded." W.D. Va. Gen. R. 4(c)(1). First, Crihfield asserts that the ALJ erred in formulating the RFC, particularly the evaluation of Crihfield's statements concerning his symptoms. *See* Pl. Br. 3–4, ECF No. 13. Second, Crihfield asserts that the ALJ erred in conducting the administrative hearing and that the ALJ should have had a medical expert testify. *See id.* at 1, 5. Third, Crihfield asserts that the ALJ erred in relying on the VE's testimony because the VE did not testify to the availability of any jobs in Danville, Virginia, where Crihfield lives. *See id.* at 4. Fourth, Crihfield asserts that his counsel was ineffective at the hearing. *See id.* at 2. Finally, Crihfield asserts that the Appeals Council erred by not granting him a new hearing based on evidence he submitted on appeal. *See id.* at 3. None of Crihfield's arguments are persuasive.

A.    *Crihfield's RFC Challenge*

     1.    *ALJ Rippel's RFC Finding*

A claimant's RFC is the most he can do on a regular and continuing basis despite his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). It is a factual finding "made by the Commissioner based on all the relevant evidence in the [claimant's] record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam), and it must reflect the combined limiting effects of impairments that are supported by the medical evidence or the claimant's credible complaints, *see Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015). The ALJ's RFC assessment "must include a narrative discussion describing" how specific medical facts and nonmedical evidence "support[] each conclusion" in his RFC finding, *Mascio*, 780 F.3d at 636, and why he discounted any "obviously probative" conflicting evidence, *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977); *see also Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). Further, the Fourth Circuit has held that a "claimant's pain and [RFC] are not separate assessments to be compared with each other," and the proper approach is for the ALJ to first compare the claimant's "alleged functional limitations from pain to the other evidence in the record" before assessing the RFC. *Mascio*, 780 F.3d at 639; *see also* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Here, although the ALJ erred in formulating the RFC before assessing the credibility of Crihfield's claimed limitations, this error was harmless because he properly analyzed Crihfield's credibility elsewhere in his written decision. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 67 (4th Cir. 2014).

ALJ Rippel found that Crihfield had a medically determinable impairment of degenerative disc disease. R. 134. He concluded that this impairment could reasonably be expected to cause Crihfield's alleged symptoms, but that Crihfield's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible "for the

reasons explained in this decision." R. 137. He identified multiple reasons throughout the opinion to support the RFC, as well as the credibility determination discussed *infra*. For the RFC, the ALJ noted that it was "supported by the state agency opinions, the degree of care received, and some of the claimant's subjective complaints." *Id.* As a result, he assessed an RFC of light work with additional postural and environmental limitations. R. 136. He found that Crihfield was limited to frequent balancing; occasional stooping, kneeling, crouching, climbing of ramps and stairs, and exposure to extreme cold, wetness, vibrations, and hazards such as unprotected heights or hazardous machinery; and could never climb ladders, ropes, or scaffolds. *Id.*

While the ALJ's opinion is not a model of clarity, it contains sufficient reasons to support his formulation of Crihfield's RFC, and thus must be affirmed. For example, the ALJ relied on the opinions of the DDS physicians who assessed Crihfield's functioning. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e). He assigned these opinions great weight and found that "they [were] balanced, objective, as well as consistent with and supported by the remainder of the record." R. 137. The ALJ's opinion here is supported by substantial evidence. The opinions of the DDS physicians represent the only medical opinions in the record on Crihfield's functioning, which the ALJ is apt to point out. *Id.* The objective evidence also supports the ALJ's conclusions. Imaging showed only moderate impairment with some nerve root complications, R. 471–72, and the observations of treating doctors revealed largely normal or mild findings, *see supra* Pt. III.A. Moreover, Crihfield does not identify objective evidence contradicting the ALJ or the opinions of the DDS physicians.

The ALJ also indicated that Crihfield failed to demonstrate that his disorders, including his degenerative disc disease and sciatica, substantially limited his ability to stand and walk. R. 137. As the claimant, Crihfield bears the burden of proving disability, and must provide more

than his subjective statements of pain or other symptoms to succeed. 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. §§ 404.1512(a), 416.912(a). Crihfield claims to have difficulty standing and walking, but he finds limited support in the objective evidence. For example, there are no pertinent observations about his gait being abnormal.[3] Additionally, while Crihfield testified that he used a cane regularly, the ALJ noted that the treatment records did not show that Crihfield medically needed a cane on a sustained basis. R. 137. Crihfield's visit to Dr. Abrokwah on February 15, 2012, represents the only instance in the medical record in which Crihfield presented to a medical doctor with a cane, and Dr. Abrokwah merely noted that Crihfield was using a cane, but did not otherwise opine that he needed the cane. R. 509. In opinions adopted by the ALJ, the DDS physicians determined that Crihfield could stand or walk for six hours in an eight hour workday, R. 137, and no other physician identified any greater limitations.

Despite this reasoning from the ALJ, Crihfield disputes the ALJ's formulation of his RFC and alleges specific errors. *See* Pl. Br. 3–4. First, Crihfield asserts that the ALJ failed to consider his scoliosis and the pain in his upper back and neck, from which he claims to suffer numbness and weakness daily. *See* Pl. Br. 4. He contends the MRI report from August 25, 2011, supports his argument. *Id.* Other than observations of scoliosis, however, the record does not document any problems with his upper back or neck, and thus provides no support for any restriction.[4] Furthermore, Crihfield disputes the ALJ's conclusion regarding his need for a cane. *See* Pl. Br. 3–4. Crihfield reasons that because he needs a cane to walk, and the VE testified that use of a cane would preclude light work, then the ALJ erred by finding he could do light work. *Id.* The

---

[3] The only observation of Crihfield with an abnormal gait was after he sustained a gunshot wound to his right foot in 2009. R. 451. The evidence in the record indicated that this impairment completely healed, R. 450, and the ALJ did not consider it to be a medically determinable impairment.

[4] The MRI Crihfield references noted normal alignment throughout the thoracic spine, with only "tiny" disc protrusion at T6-T7. R. 471. The rest of the imaging concerns the lumbar spine. R. 471–72.

16

ALJ concluded, however, that the record did not show that Crihfield medically needed a cane on a sustained basis, and this conclusion is supported by substantial evidence. Thus, Crihfield's arguments regarding his RFC are not persuasive.[5]

### 2.    Evaluation of Symptoms

Crihfield also challenges the ALJ's evaluation of his symptoms, as he claims that the ALJ did not properly assess his subjective complaints of pain. *See* Pl. Br. 3. The regulations set out a two-step process for evaluating a claimant's allegation that he is disabled by symptoms, such as pain, caused by a medically determinable impairment. *Fisher v. Barnhart,* 181 F. App'x 359, 363 (4th Cir. 2006) (citing 20 C.F.R. §§ 404.1529, 416.929). The ALJ must first determine whether objective medical evidence[6] shows that the claimant has a medically determinable impairment that could reasonably be expected to cause the kind and degree of pain alleged. 20 C.F.R. §§ 404.1529(a)–(b), 416.929(a)–(b); *see also Craig*, 76 F.3d at 594. If the claimant clears this threshold, then the ALJ must evaluate the intensity and persistence of the claimant's pain to determine the extent to which it affects his physical or mental ability to work. SSR 16-3p, 2016 WL 1119029, at *4 (Mar. 16, 2016); *see also Craig,* 76 F.3d at 595.

The ALJ cannot reject the claimant's subjective description of his pain "solely because the available objective medical evidence does not substantiate" that description. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2). Nonetheless, a claimant's allegations of pain "need not be

---

[5] Crihfield also disputed the VE's testimony regarding a sit/stand option for the jobs he identified. *See* Pl. Br. 4. This challenge is moot, however, because the ALJ did not include a sit/stand option in his RFC, and, as discussed above, the ALJ reasonably determined that Crihfield could perform light work.

[6] Objective medical evidence is any "anatomical, physiological, or psychological abnormalities" that can be observed and medically evaluated apart from the claimant's statements and "anatomical, physiological, or psychological phenomena [that] can be shown by the use of medically acceptable diagnostic techniques." 20 C.F.R. §§ 404.1528(b)–(c), 416.928(b)–(c). "Symptoms" are the claimant's description of his or her impairment. *Id.* §§ 404.1528(a), 416.928(a).

17

accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges [he] suffers." *Craig*, 76 F.3d at 595.[7] The ALJ must consider all the evidence in the record, including the claimant's other statements, his daily activities, his treatment history, any medical-source statements, and the objective medical evidence, *id.* (citing 20 C.F.R. §§ 404.1529(c), 416.929(c)), and must give specific reasons, supported by relevant evidence in the record, for the weight assigned to the claimant's statements, *Eggleston v. Colvin,* No. 4:12cv43, 2013 WL 5348274, at *4 (W.D. Va. Sept. 23, 2013). A reviewing court will defer to the ALJ's finding except in those "exceptional" cases where the determination is unclear, unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all. *Bishop*, 583 F. App'x at 68 (citing *Edelco, Inc. v. NLRB,* 132 F.3d 1007, 1011 (4th Cir. 1997)); *see also Mascio,* 780 F.3d at 640.

ALJ Rippel's decision provides sufficient reasons to support the decision to reject Crihfield's statements concerning the intensity, persistence, and limiting effects of his symptoms. First, he noted that Crihfield's care was generally conservative, which the ALJ is permitted to consider when evaluating the severity of the claimant's symptoms. *See Dunn v. Colvin*, 607 F. App'x 264, 275 (4th Cir. 2015) ("[I]t is well established in this circuit that the ALJ can consider the conservative nature of a claimant's treatment in making a credibility determination . . . ."); 20

---

[7] The Social Security Administration now cautions that the second prong of this analysis should not be approached with an undue focus on the claimant's "credibility." *See* SSR 16-3p, 2016 WL 1119029, at *1. The scope of this inquiry should be limited to those matters concerning the claimant's symptoms, rather than other factors that might otherwise be probative of the claimant's overall honesty. *Id.* at *10. "In evaluating an individual's symptoms, [ALJs] will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person." *Id.* Statements that are internally inconsistent or that are inconsistent with the other evidence of record, however, may lead the ALJ to "determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities." *Id.* at *7.

C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). Crihfield alleged that he had been unable to seek medical treatment since mid-2012 because he did not have insurance. *See* Pl. Br. 3. He also testified that although one doctor recommended surgery, he did not proceed with it because it would be too expensive without insurance. R. 152–55. Crihfield's statements, however, do not find support in the record. The potential of surgery was only discussed twice, and in neither instance did the treating doctor recommend that Crihfield have surgery. *See* R. 451–52, 458. Other than these statements, Crihfield offers no explanation for why his treatment was primarily limited to receiving medications, a course the ALJ deemed conservative. Thus, the ALJ's conclusion that Crihfield's care was generally conservative finds support in the record and was properly used in evaluating Crihfield's statements concerning his symptoms.

The ALJ also noted that Crihfield subjectively reported that he could function after analgesia, R. 137, implying that the prescribed medications were effective in controlling his pain. Pain is not disabling if it can be reasonably controlled with medication. *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986); *Fisher v. Comm'r of Soc. Sec.*, No. 6:11cv26, 2013 WL 1192576, at *4 (W.D. Va. Mar. 22, 2013). The record amply supports the ALJ's reasoning. Without question the record shows that Crihfield experienced pain, but it also shows that medications were effective in controlling it, *see* R. 444, and Crihfield himself stated on numerous occasions that he could function with analgesics, *see* R. 456–58, 505–09. He also consistently noted he could engage in activities such as house and yard work with analgesics. *See* R. 156, 297, 505–09. To the extent then that the ALJ discounted Crihfield's statements concerning his symptoms because of his stated ability to function after analgesia, this conclusion is supported by substantial evidence.

19

The lack of support in the record for Crihfield's claimed need for a cane is also pertinent to the ALJ's evaluation of Crihfield's statements concerning his symptoms. Inconsistencies between the claimant's statements and the medical evidence is proper for the ALJ to consider in a credibility analysis. *See Craig*, 76 F.3d at 594 (quoting 20 C.F.R. §§ 404.1529(a), 416.929(a)). As noted above, although Crihfield argued at the hearing, R. 154, and in his brief, Pl. Br. 3–4, that he needed a cane and that it was prescribed by a doctor, the ALJ concluded that the records did not show that he medically needed a cane to ambulate on a sustained basis, R. 137. This conclusion is supported by substantial evidence. Accordingly, the ALJ's finding that Crihfield's functional abilities are not as limited as he claims is supported by substantial evidence.

## B. Remaining Challenges

Crihfield's four remaining arguments are also unpersuasive. First, Crihfield alleges the ALJ erred by conducting a short, twenty-six-minute hearing and by failing to notice Crihfield's confusion and lack of comprehension throughout. *See* Pl. Br. 1. An ALJ, however, has wide latitude in running an administrative hearing, *see Richardson*, 402 U.S. at 400; *see also Ass'n of Admin. Law Judges, Inc. v. Heckler*, 594 F. Supp. 1132, 1141 (D.D.C. 1984) ("The conduct of the hearing rests generally in the ALJ's discretion . . . ."), and I see no defect in the ALJ's handling of the hearing. Crihfield also alleges the ALJ erred by failing to call a medical doctor as a witness. *See* Pl. Br. 5. ALJ Rippel did not err, however, as the decision to obtain the opinion of a medical expert is wholly within the ALJ's discretion, and here the record is adequate for the ALJ to render a decision. *See Behnke v. Colvin*, No. 2:14cv12, 2015 WL 2151786, at *12 (W.D. Va. May 7, 2015); 20 C.F.R. §§ 404.1527(e)(2)(iii), 416.927(e)(2)(iii).

Second, Crihfield alleges that because the VE did not testify about the number of jobs available specifically in Danville, Virginia, the ALJ erred in relying on his testimony. Pl. Br. 4.

Crihfield's argument fails because it was appropriate for the VE to construe all of Virginia as the local economy. *See* 20 C.F.R. §§ 404.1566(a)(1), 416.966(a)(1) ("It does not matter whether work exists in the immediate area in which you live . . . ."). Furthermore, under Fourth Circuit precedent, the VE identified a sufficient number of available jobs in Virginia, including packer (2100 in Virginia and 203,000 nationally), cashier (2600 in Virginia and 200,000 nationally), and café attendant (1200 in Virginia and 109,000 nationally). R. 138–39, 161–62. *See Hicks v. Califano*, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979) (finding that approximately 110 jobs locally was not "an insignificant number" of jobs under the regulations); *Chestnut v. Colvin*, No. 4:13cv8, 2014 WL 2967914, at *2 n.4, *10 & n.16 (W.D. Va. June 30, 2014) (Kiser, J.) (holding that substantial evidence supported the ALJ's conclusion that the claimant was not disabled because she could perform one occupation with 26,609 jobs in the national economy and 920 jobs in her home state).

Third, Crihfield alleges that the ALJ erred by not noticing that Crihfield's attorney was ineffective and confusing him with another client. *See* Pl. Br. 2. As a Social Security claimant, however, Crihfield has no right to counsel and therefore cannot succeed on a claim of ineffective assistance of counsel. *See Cornett v. Astrue*, 261 F. App'x 644, 651 (5th Cir. 2008) (explaining that the Supreme Court has never recognized a constitutional right to counsel in Social Security proceedings); *see also Behnke*, 2015 WL 2151786, at *12 (noting that when the claimant is represented by counsel, the ALJ has a right to assume that counsel is presenting the claimant's strongest case for benefits). Furthermore, the hearing transcript does not show that his counsel was ineffective.

Fourth, Crihfield contends that the new evidence he submitted to the Appeals Council demonstrates that he is disabled. *See* Pl. Br. 3. As the Appeals Council correctly noted, R. 2, the

newly submitted evidence, which consists of records dated more than one year after the ALJ's decision, is about a later time and does not affect ALJ Rippel's decision of whether Crihfield was disabled on or before April 25, 2014. The proper approach regarding this additional evidence is for Crihfield to file a new claim for benefits, not for this Court to remand the ALJ's decision for consideration of this evidence.

## V. Conclusion

For the foregoing reasons, I find that substantial evidence supports the Commissioner's final decision. Accordingly, I respectfully recommend that Crihfield's motion for summary judgment, ECF No. 13, be **DENIED**, the Commissioner's motion for summary judgment, ECF No. 14, be **GRANTED**, the Commissioner's final decision be **AFFIRMED**, and this case be **DISMISSED** from the Court's active docket.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: January 13, 2017

Joel C. Hoppe
United States Magistrate Judge